UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
04 MAR 18 AM 7:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

ANITA JONES,       )
                   )
    Plaintiff,     )
                   )
vs.                )       Civil Action No. CV-02-S-2110-NE
                   )
WALMART STORES, INC.,   )
                   )
    Defendant.     )

## MEMORANDUM OPINION

This action is before the court on defendant's motion for summary judgment,[1] and, defendant's motion to strike plaintiff's evidentiary submission.[2]   Upon consideration of defendant's motion for summary judgment, the parties' briefs in support of[3] and in opposition to the motion,[4] and the evidentiary materials submitted by both parties,[5] the court concludes the motion should be granted.   Defendant's motion to strike will be denied.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment

---

[1]Doc. no. 26.

[2]Doc. no. 45.

[3]Doc. no. 26, at Exhibit E (brief in support of motion for summary judgment).

[4]Doc. no. 36.

[5]Doc. no. 26, at Exhibits A-D (defendant's evidentiary submissions); doc. no. 33 (plaintiff's evidentiary submission).



not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled

to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

## II. FACTUAL BACKGROUND[6]

### A.   Plaintiff's Position At The Wal-Mart Distribution Center

The Wal-Mart Distribution Center located in Cullman, Alabama ("the Distribution Center"), is a 1.2-million-square-foot facility which receives merchandise from manufacturers and stores it for eventual shipment to Wal-Mart retail stores in the Cullman area.[7]  Plaintiff Anita Jones commenced her employment at the Distribution Center on May 12, 1986.[8]  She began working as a "slotter" in late 1999.[9]  A slotter is responsible for checking each pallet of freight delivered to the Distribution Center and ensuring that it is stored in the proper place.[10]  The slotter reviews the purchase order attached to each pallet of freight, and then inspects the pallet to verify that it contains the same type and quantity of merchandise as stated on the purchase order.[11] The slotter scans the purchase order with a hand-held computer, which assigns a

---

[6]Plaintiff adopted all facts set forth in defendant's brief in support of summary judgment, and added only a few additional facts in her brief. *See* doc. no. 36 (plaintiff's brief in opposition to summary judgment).

[7]Doc. no. 26 (motion for summary judgment), Exhibit B (Declaration of Tim Morrison), at ¶ 2; *id.,* Exhibit C (Declaration of Jim Yoho), at ¶2.

[8]Doc. no. 26 (motion for summary judgment), Exhibit A (Deposition of Anita Jones), at 9.

[9]Jones Deposition, at 12.

[10]*Id.* at 13-15.

[11]Motion for summary judgment, Exhibit D (Deposition of Tim Morrison), at 141-42.

section of the Distribution Center (or "slot") in which the freight should be stored pending distribution to retail outlets.[12]  The slotter then writes the appropriate slot number on a sticker (or "tag"), and attaches the tag to one of the boxes of freight.[13]

After the slotter assigns incoming freight a slot, a "PE driver" moves the merchandise to the designated slot, operating a machine similar to a forklift.[14]  During the time period that plaintiff worked as a slotter, approximately eleven slotters and nine PE drivers worked each shift.[15]  Most of the slotters who worked on plaintiff's shift were females.[16]

Plaintiff's job performance as a slotter was monitored by members of defendant's Quality Assurance Department ("QA").  Three to four QA representatives worked each night to verify that all freight delivered during the preceding day had been correctly identified, counted, and slotted.[17]

## B.    Offensive Behavior At The Distribution Center

### 1.    General use of profanity by plaintiff's co-workers

Approximately fifty people worked in plaintiff's area of the Distribution Center

---

[12]Jones Deposition, at 13-14, 25; Morrison Deposition, at 143.

[13]Jones Deposition, at 13-14; Morrison Deposition, at 143-44.

[14]Jones Deposition, at 14.

[15]*Id.* at 18, 56.

[16]*Id.* at 24.

[17]*Id.* at 24, 104; Morrison Declaration, at ¶ 5.

at any given time during her tenure as a slotter, and approximately sixty percent of those people, including both males and females, regularly used language that plaintiff found offensive.[18]   Plaintiff testified that her co-workers "constantly" uttered profanities, but most of the language was not specifically directed at her.[19]   Rather, plaintiff characterized her co-workers' use of profanity as "[j]ust the usual, everyday profanity on the dock.  The guys get mad at their freight, their forklift, each other. They cuss each other out."[20]

Plaintiff's male and female co-workers also talked about sexual matters.[21] Plaintiff stated that "Neal Faulkner, Tim Faulkner, Lee Arnold, and Gary Henke[22] persistently and on a daily basis made lewd and vulgar remarks to myself and other employees, and made lewd and vulgar sexually explicit jokes on a daily basis."[23] When plaintiff overheard sex-related discussions, she would "put a stop to it" by telling her co-workers she "[didn't] want to hear it."[24]   Plaintiff also stopped co-

---

[18]Jones Deposition, at 35.  Plaintiff specifically points to the use of the words "mother fucker," "god damn," and "son of a bitch." *Id.* at 36.  Plaintiff does not complain about any behavior that took place *before* she began working as a slotter.

[19]*Id.* at 48.

[20]*Id.* at 49.

[21]*Id.* at 50.

[22]Faulkner, Faulkner, Arnold, and Henke all are male co-workers of plaintiff.

[23]Doc. no. 33 (plaintiff's evidentiary submission), at Exhibit A (Affidavit of Anita Jones). Defendant argues that plaintiff's affidavit should be stricken from the record.  The court disagrees, as stated more fully in § III(A), *infra.*

[24]Jones Deposition, at 50.

workers from relating sexual jokes before they "go[t] to the offensive part."[25] Sometimes plaintiff simply would ignore the sex-related talk, because she believed it "was not [her] conversation."[26]

### 2.     Offensive comments directed toward plaintiff

Gary Henke, one of plaintiff's co-workers, often used profanity in her presence, because he knew the language offended her.[27] Plaintiff testified that Henke used offensive language "pretty regular [sic] just for the heck of it," and that "every other word is bad out of [Henke's] mouth."[28] When plaintiff informed Henke that his language offended her, he began to call her "Ms. Goody Two-Shoes" and "Virgin Ears."[29] Henke called plaintiff "Goody-Two Shoes" approximately one hundred times during the one-and-one-half years she worked with him.[30] After plaintiff complained to manager Ed Royster about the use of offensive language in her work area, other male employees also began to call plaintiff "Goody-Two-Shoes." Henke told other employees that they should watch everything they said around plaintiff, because she would get them in trouble if they were not careful.[31] No female co-workers ever made

---

[25]*Id.* at 51-52.

[26]*Id.* at 52.

[27]*Id.* at 37.

[28]*Id.* at 59-61.

[29]*Id.* at 37.

[30]*Id.* at 54.

[31]*Id.* at 53-54.

fun of plaintiff or called her names, even though plaintiff also had complained about the females' regular use of profanity.[32]

On one occasion, PE driver Lee Arnold directed offensive language to plaintiff. Manager David McCormick had confronted Arnold about his refusal to "keep the dock clean" by assisting slotters in moving freight to storage areas.  Following Arnold's confrontation with McCormick, Arnold became angry with plaintiff for not telling McCormick that Arnold had moved her freight.  Arnold told plaintiff that "he could go down any GD aisle and do anything he D wanted to do to any of the pallets and there's not anything the SOBs up front could do about it."[33]  Arnold said "fuck you" to plaintiff, and added that he would "get" her.[34]

One hot day in July, co-worker Neal Faulkner, in the presence of another female co-worker, yelled to plaintiff, "Are you hot?"  Plaintiff responded, "yes, I am," and Faulkner said, "well, I'm not going to F you."[35]  Faulkner and the female employee laughed after Faulkner made the comment, but plaintiff did not say anything in response.[36]

---

[32]*Id.* at 57-58.

[33]*Id.* at 43-44.

[34]*Id.*

[35]*Id.* at 47.

[36]*Id.* at 47-48.

### 3.     Offensive touching

On one occasion, plaintiff witnessed Henke placing his hand on a female co-worker's buttocks.[37]  When Henke realized that plaintiff could see him, he laughed, patted the female's buttocks, and walked away.[38]  No co-employee ever propositioned plaintiff sexually, however, or touched her in an offensive manner.[39]

### 4.     Offensive language directed toward managers

Plaintiff's male and female co-workers also used offensive language in the presence of managerial employees.[40]  When shift manager David McCormick confronted Lee Arnold about his refusal to "keep the dock clean" by more quickly moving slotters' freight into storage areas, Arnold told McCormick he was a liar, said "FU," and threatened to report McCormick to a higher member of management for harassment.[41]

Manager Frankie Hamby once reprimanded Arnold for not staying on his PE machine, and for working outside his assigned work area.  Arnold told Hamby that "if he could do any better he could get on the GD machine and do it his GD self."[42]

---

[37]*Id.* at 60.

[38]*Id.*

[39]*Id.* at 61.

[40]*Id.* at 68.

[41]*Id.* at 39.

[42]*Id.* at 68.

One female employee identified only as "Christy"[43] became angry over her assigned work load, and told McCormick that "[s]he didn't want that GD load and if he wanted it the F off he could get it himself."[44]   McCormick did not reprimand her for insubordination, but laughed and started to assist her.  McCormick told plaintiff, "she got mad, didn't she?"  Plaintiff said, "yes, and you should stop some of the language."  McCormick responded that he did not want to get that involved, and dismissed the incident because Christy was "just mad."[45]

### 5.   Offensive language used by managers

Plaintiff can identify only one manager who used language she found to be offensive.  Plaintiff witnessed Hamby get into an argument with a female employee named "Tammy" over unloading freight.[46]  Tammy told Hamby "[s]he didn't want the D load, and [Hamby] told Tammy she better get the D load off today or she'd catch H for it."[47]  The record does not reflect any incident in which a manager or supervisor specifically directed offensive language at plaintiff.  Plaintiff also never heard any supervisor or manager make a negative or demeaning comment about females.[48]

---

[43]The record does not reflect what Christy's last name is.

[44]*Id.* at 69.

[45]*Id.*

[46]*Id.* at 70-73.  Plaintiff could not identify Tammy's last name in her deposition.  *Id.* at 73.

[47]*Id.*

[48]*Id.* at 147-48.

**C.     Wal-Mart's Policies Regarding Profanity, Harassment, and Discrimination**

Wal-Mart's policies regarding profanity, harassment, and discrimination in the workplace are embodied within the "Associate Handbook" ("Handbook") Wal-Mart distributes to its employees. Plaintiff signed "Acknowledgment" forms in 1991, 1994, 1998, and 2001, each time acknowledging her receipt of the most current version of the Handbook, and her understanding of the policies embodied within the Handbook.[49] The version of the Handbook that was in place during the time plaintiff worked as a slotter[50] prohibited the use of profanity in the workplace. Specifically, the Handbook provided that "[p]rofanity has no place at work, wherever your work location or whatever the circumstances. It will not be tolerated."[51]

Wal-Mart also encourages open communication between its associates and management employees. To further this goal of open communication, Wal-Mart adopted the following "Open-Door" policy:

> Our Open Door Policy says that if you have an idea or a problem, you should go to your Supervisor to talk about it without fear of retaliation. Faster resolution may occur when the Associate goes through the immediate Supervisor first. However, if the Associate feels the Supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, the Associate may go to any level of

---

[49] Jones Deposition, at Exhibits 10-13.

[50] *Id.* at Exhibit 14. Plaintiff recognized that the version of the Handbook appended to her deposition transcript as Exhibit 14 corresponded with the acknowledgment forms she signed in 1998 and 2001. Jones Deposition, at 179.

[51] *Id.,* Exhibit 14, at 21.

management in the Company.   Remember, while the Open Door promises that you will be heard, it cannot promise that your opinion will always prevail.  Any suppression of, or retaliation for using the Open Door Policy *by a Supervisory Associate* may result in disciplinary action, up to and including termination.[52]

The Handbook also sets forth Wal-Mart's policy regarding harassment in the

workplace, *i.e.*:

> Harassment or Inappropriate Conduct of any type, whether sexual, ethnic, or racial, is not tolerated at Wal-Mart.  Wal-Mart is committed to maintaining a work environment that is free of unlawful harassment as well as other inappropriate conduct, regardless of whether the conduct rises to the level of unlawful harassment.  We want to provide a work environment where everyone is comfortable.
>
> **Any negative or stereotypical comment or action, whether welcome or unwelcome, aimed at an individual's gender, race, religion, physical or mental disability, physical appearance, age, marital status, national origin, color, or sexual orientation is inappropriate at Wal-Mart and will not be tolerated.**
>
> Associates who engage in any type of harassment or inappropriate conduct on Wal-Mart property, at Wal-Mart sponsored functions, or while traveling on behalf of the Company, whether "on the clock" or not will be subject to disciplinary action up to and including termination.
>
> Associates who are subjected to conduct prohibited under this policy are encouraged to report their concern to any member of management.  Prompt action will be taken and no retaliation will occur against the Associate making the report.   All allegations of harassment/inappropriate conduct will be investigated.   Appropriate action will be taken to eliminate such conduct and to ensure there will be no recurrence of the conduct.  If you, or someone you work with, have been a victim of harassment or inappropriate conduct, you should

---

[52]*Id.* at 7 (emphasis supplied).

immediately report the offensive conduct to your immediate Supervisor or any member of the Management team.  You may also contact your Regional Personnel Manager, the People Group, or the Ethics Hotline (1-800-WMETHIC).

You can be sure your report will be thoroughly investigated and appropriate action taken.  Confidentiality will be maintained *to the extent practical*, and no retaliation will be taken against Associates who report harassment.[53]

All of the foregoing policies were posted in the offices and break rooms of the Distribution Center.[54]  The policies also were reiterated periodically at employee meetings, and are accessible through defendant's "Computer-Based Learning System," which employees are encouraged to utilize.[55]  The "Ethics Hotline" (toll-free telephone number) mentioned in the Handbook also is posted in the Distribution Center, along with the telephone numbers for all members of the Distribution Center's upper-level management.[56]

**D.    Plaintiff's Complaints To Management**

Plaintiff lodged her first complaint about the use of profanity with then-manager, Ed Royster, in the spring of 2000.[57]  Royster told plaintiff he would not tolerate profanity in the workplace, and personally discussed her complaint with

---

[53]*Id.* at 24-25 (boldface emphasis in original, italicized emphasis supplied).

[54]Jones Deposition, at 34.

[55]Yoho Declaration, at ¶ 4.

[56]*Id.* at ¶ 5; Jones Deposition, at 34.

[57]Jones Deposition, at 65.

Henke. Royster also raised plaintiff's concerns at the daily "start-up" meeting the following morning, telling the employees on plaintiff's shift that they needed to "cut down on the profanity."[58] Despite Royster's warnings, the profanity continued.[59]

Plaintiff complained to Royster two or three more times during the spring of 2000. Each time she complained, Royster told plaintiff that he "would handle it," that he "would take care of it," or that he was "working on it."[60] Even so, the profanity continued.

Plaintiff's next complaint was to David McCormick, who became her manager during the fall of 2000.[61] She discussed the profanity problem with McCormick two or three times during the time he supervised her. She also told McCormick about the comment Neal Faulkner had made to her, *i.e.,* "I'm not going to fuck you."[62] McCormick told plaintiff he "would deal with it," and he was "working on it." The record does not reflect what action, if any, McCormick took in response to plaintiff's complaint; however, the offensive language continued.[63]

Plaintiff then complained to Jason Phillips, who became her manager in early

---

[58]*Id.* at 66.

[59]*Id.* at 67.

[60]*Id.* at 75-76.

[61]*Id.* at 85.

[62]*Id.* at 93.

[63]*Id.* at 85-87.

2001. She voiced her concerns to Phillips two to three times. Each time, Phillips told plaintiff he would "work on it."[64]  Plaintiff also complained to Tony Haistens, the operations manager, in early 2001.[65]  She told Haistens that she felt as if she had "joined the Navy" instead of the Wal-Mart work force.  Haistens told her he would "work on it."[66]  The record does not reflect what action, if any, that either Phillips or Haistens took in response to plaintiff's complaints.

Plaintiff next called the Associate Hotline number[67] during the summer of 2001, and complained to a representative at the Wal-Mart Home Office in Bentonville, Arkansas, about the profanity used in her workplace, and about the threats Arnold had made to her.[68]  She informed the Home Office representative that she had complained to her supervisors, and given her supervisors a chance to correct the problem, but that she never got an adequate response.[69]

Following plaintiff's call to the Home Office, the Personnel Manager for the Distribution Center, Jim Yoho, conducted an investigation of plaintiff's complaints. Yoho personally counseled each employee in plaintiff's work area that the use of

---

[64]*Id.* at 89.

[65]*Id.* at 21, 90-91.

[66]*Id.* at 90-91.

[67]This number is referred to in the Handbook as the "Ethics Hotline."

[68]*Id.* at 96-98.

[69]*Id.*

profanity would not be tolerated.[70]  The company's written policy against the use of

profanity also was verbally reiterated to all employees at the next morning's "start-up

meeting."[71]   However, no written warnings or reprimands were issued to any

employee.[72]

Yoho and Tony Hastings met separately with Lee Arnold to discuss his use of

profanity and the threat he made to plaintiff.[73]  Yoho and Hastings informed Arnold

that if the accusations against him were substantiated, he could be terminated.[74]

Arnold was issued a verbal "coaching" for his conduct.[75]

As a result of his investigation, Yoho determined that a change in leadership

might help alleviate some of plaintiff's concerns.  Accordingly, Yoho assigned Jim

Hutchinson, an experienced Area Manager, to supervise plaintiff's work area.  Yoho

also assigned an Area Manager Trainee "to help enforce Wal-Mart's prohibition of

profanity in the workplace and support other policy and performance initiatives."[76]

Despite these efforts, plaintiff still had problems with her co-workers' use of

---

[70]*Id.* at 97; motion for summary judgment, Exhibit D (Deposition of Jim Yoho), at 46.

[71]Yoho Deposition, at 50.

[72]*Id.* at 51.

[73]*Id.* at 181-82.

[74]*Id.* at 183-84.

[75]*Id.* at 179.  The successive levels of Wal-Mart's disciplinary procedure are set forth more fully in § II(E)(2), *infra.*

[76]Yoho Declaration, at ¶ 3.

offensive language. Thus, plaintiff complained to Jim Hutchinson, who became her manager during the fall of 2001. She told Hutchinson the profanity was "getting way out of hand." Hutchinson told plaintiff he "would handle it." The record does not reflect what action, if any, that Hutchinson took in response to plaintiff's complaint.[77]

Following plaintiff's complaint to the Wal-Mart home office and Yoho's subsequent investigation, a District Manager named Larry called plaintiff to see if her working conditions had improved. Plaintiff informed Larry that there had not been any changes. Plaintiff also testified at her deposition that the working conditions, and particularly the use of profanity, did not improve at all after Yoho conducted his investigation.[78]

## E.    Plaintiff's Disciplinary History at Wal-Mart

### 1.    Types of errors slotters can commit

A slotter at the Distribution Center can be disciplined for two basic types of errors, *i.e.,* "accuracy" errors and "procedure" errors. An accuracy error can consist of either a "wrong item" error or a "wrong quantity" error.[79] A wrong item error occurs when a slotter labels a pallet as containing an item that the pallet does not

---

[77]*Id.* at 94-95.

[78]Jones Deposition, at 98-99.

[79]Morrison Declaration, at ¶ 3.

actually contain.[80]   A wrong quantity error occurs when a slotter labels a pallet as containing the incorrect number of boxes.[81]

Procedure errors fall into two primary categories: "wrong area" errors and "wrong pack" errors.  Wrong area procedure errors occur when a slotter sends a pallet of freight to the wrong department of the Distribution Center.  Wrong pack errors occur when a slotter incorrectly describes the way in which the freight on each pallet is packaged.[82]  Slotters generally incur procedure errors when they fail to actually open each box of freight to verify its contents.[83]

### 2.   Progressive steps on Wal-Mart's disciplinary ladder

A slotter receives a "coaching," which can be either an oral reprimand or a low-level written warning, for her first *procedure* error.  All future procedure errors result in "Step" disciplinary write-ups, which become part of the employee's work record.  Repeated procedure errors result in "Step 1," "Step 2," and "Step 3" write-ups.  If a slotter incurs a procedure error after receiving a Step 3 write-up, the slotter will be terminated.[84]

---

[80]*Id.*  Morrison gave the following example of a "wrong item" error: *i.e.,* "where the slotter labels a pallet as having red candles when it actually contains blue candles."  *Id.*

[81]*Id.*

[82]For example, a slotter would incur a "wrong pack" procedure error if she labeled a pallet "as having boxes containing 24 bottles of shampoo, packaged as 2 packs of 12 bottles, when the boxes actually contain 4 packs of 6 bottles."  *Id.*

[83]*Id.*

[84]Morrison Declaration, at ¶ 8.

Assistant General Manager Tim Morrison described the disciplinary procedure for slotters who receive accuracy errors as follows:

> Five <u>accuracy</u> errors in a four-week period results in a "Coaching" discipline . . . . After five coachings, a slotter receives a "Step 1" write-up; after three more coachings, a slotter receives a "Step 2" write-up; after two more coachings, a slotter receives a "Step 3" write-up; and any other coaching following the "Step 3" write-up results in termination. If a slotter has [m]ore than five accuracy errors <u>in one week</u>, however, it results in a "Step" write-up and not a coaching.  All coachings and Step write-ups remain active for six months.[85]

### 3.    Plaintiff's coachings and step write-ups

Plaintiff committed a wrong area procedure error on June 28, 2001.[86]  She committed a wrong pack procedure error on July 4, 2001, for which she received a Step 1 write-up.[87]  Next, she committed a wrong area procedure error on July 31, 2001, and received a written "Coaching."[88]

Plaintiff received a Step 2 write-up on August 2, 2001, for incurring ten accuracy errors in one week.[89]  She initially refused to sign the write-up form, asserting that she could not have made the errors because she "was very extremely

---

[85]*Id.* (emphasis in original).

[86]Morrison Deposition, at 110-11.  The record does not reflect whether plaintiff received a "coaching" for committing this procedure error, as normally would be required under defendant's disciplinary procedures.

[87]Jones Deposition, at Exhibit 1; Morrison Deposition, at 113.  Plaintiff admitted that she made the error which led to her Step 1 write-up.  Jones Deposition, at 123.

[88]Morrison Deposition, at 113.

[89]Jones Deposition, at Exhibit 2.

[sic] careful that day . . . ."[90]  Plaintiff eventually signed the form on August 22, 2001,

after Haistens told her that if she didn't sign it, her discipline would be elevated to a

Step 3.[91]  However, plaintiff still maintained that she did not make the errors for which

she received the Step 2 write-up.  Rather, she complained to Tim Morrison that Lee

Arnold had been intentionally switching the tags on her pallets of freight so that the

tag would not accurately describe what was contained in the pallet of freight, thus

causing plaintiff to be charged with an accuracy error.[92]  Plaintiff believed Arnold

switched her tags to follow through with the threat he made to her, *i.e.,* that he was

going to "get" her.[93]  Plaintiff also believed that her co-workers switched the tags on

her freight as a result of the complaints she made to management about their use of

profanity.

Morrison investigated plaintiff's allegations of "tag-switching," but he was

unable to verify whether the tags had been switched on four of plaintiff's pallets of

freight, because the freight already had been shipped out of the Distribution Center.[94]

Because management could not verify whether the tags had been switched on these

four pallets of freight, General Manager Ken Caviness removed four of the accuracy

---

[90]Jones Deposition, at 125.

[91]Jones Deposition, at 126-27.

[92]Jones Deposition, at 77-80; 128-29.

[93]*Id.* at 128-29.

[94]Morrison Deposition, at 119-20.

errors from plaintiff's disciplinary record.[95]  In the six pallets of freight remaining in the Distribution Center, Morrison found no evidence of "tag-switching."[96]  Caviness suggested that, to prevent any future occurrences of "tag-switching," plaintiff should draw a line across the edge of her tags with a marker, so that it would be easy to identify any tags that had been switched.[97]

Plaintiff received a "Step 3" write-up on November 6, 2001, for committing six accuracy errors in one week.[98]  Plaintiff signed the write-up form, but she again disputed that she made the errors leading to the write-up, insisting instead that she had been "extremely careful" and that the errors must have resulted from switched tags.[99]  Plaintiff was aware that if she incurred any accuracy errors after the Step 3 write-up, she could be terminated.[100]

On November 21, 2001, plaintiff was called into Yoho's office. Yoho informed her that she had committed another accuracy error which "put [her] over the limit," and that she was being terminated.[101]  Yoho also informed plaintiff that she could

---

[95]Jones Deposition, at 132.

[96]Morrison Declaration, at ¶ 12.

[97]Jones Deposition, at 131-32. Plaintiff followed Caviness' suggestion until her employment with defendant was terminated.

[98]*Id.* at Exhibit 3.

[99]*Id.* at 135-36.

[100]*Id.* at 137.

[101]*Id.* at 140; *id.* at Exhibit 5; Yoho Declaration, at ¶ 8.

come back to the office the following week to fill out an application for another job on another shift, most likely a weekend shift.[102]   Although Yoho told plaintiff he would "highly recommend" that she be rehired if she applied, plaintiff did not apply for another job at the Distribution Center.[103]  Plaintiff stated that she is not interested in working at the Distribution Center again, because she does not want to be subjected to the profanity-filled environment, and because she does not want to work on weekends.[104]

## F.   Discipline Received By Other Wal-Mart Employees

At her deposition, plaintiff identified only one other slotter, Linda Rooker, who was terminated for accuracy errors during the time plaintiff was employed as a slotter.[105]  Plaintiff identified two other employees in her work area, Ranae Lee and Joan Sloane, who received "Step 1" write-ups for accuracy errors.[106]  Plaintiff also stated that, during the summer of 2001, Ranae Lee made 24 accuracy errors, but was not disciplined at all for the errors.[107]  Other than Ranae Lee, plaintiff could point to no employees who failed to receive the appropriate discipline for errors they

---

[102]Jones Deposition, at 140.

[103]*Id.* at 142.

[104]*Id.* at 114-15; 141-42.

[105]*Id.* at 154-55.

[106]*Id.* at 159.

[107]*Id.* at 160-61.

committed.[108]

### G.    Plaintiff's Post-Wal-Mart Work History

After plaintiff's employment with Wal-Mart was terminated, she received unemployment benefits of approximately $190 per week until June of 2002. Plaintiff has held only one job since she worked at the Distribution Center. In January of 2002, she began working as a substitute lunchroom worker in the Cullman County School System. She worked approximately twenty days in 2002, and each day she worked she earned approximately $48.00. At the time of her deposition on May 19, 2003, plaintiff had worked forty days in 2003.[109]

Plaintiff has submitted applications for a full-time job as a lunchroom worker in both the Cullman County Schools and the Madison County Schools. She has not applied for any other employment, because she wants to leave her schedule open to substitute in the school lunchrooms anytime her services are needed. She believes that being available to substitute on a regular basis will help her get a full-time position in the schools.[110] She did not apply for employment at any other Wal-Mart facility in the area, because she "didn't figure [she] really had a chance . . . ."[111] She also did not

---

[108]*Id.* at 162.
[109]*Id.*
[110]*Id.* at 111-13.
[111]*Id.* at 116.

apply for employment at any of the other warehouse facilities in the area, because she believes few positions are available at those facilities for women.[112]

## H.    Plaintiff's EEOC Charge And Complaint

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 25, 2002,[113] and the EEOC issued plaintiff a Notice of Right to Sue on May 31, 2002.[114]  Plaintiff subsequently filed suit in this court on August 29, 2002, invoking this court's subject matter jurisdiction under 28 U.S.C. § 1343, 28 U.S.C. § 1331, and 42 U.S.C. § 2000e-5(f)(3).[115] Plaintiff's complaint asserted claims that defendant discriminated against her on the basis of her sex, subjected her to a hostile work environment, and committed the tort of intentional infliction of emotional distress.

## III. DISCUSSION

### A.    Motion To Strike

Defendant argues that plaintiff's affidavit, her sole evidentiary submission in response to defendant's motion for summary judgment, should be stricken from the record because it "directly and unequivocally contradicts her prior sworn deposition

---

[112]*Id.* at 114-19.

[113]*Id.* at Exhibit 7.

[114]*Id.* at Exhibit 8.

[115]Doc. no. 1 (complaint), at ¶ 4.

testimony and refers to retaliation, which is not a claim in this case."[116]

### 1.    Plaintiff's affidavit is not inherently inconsistent with plaintiff's deposition testimony

Defendant correctly points out that, in this circuit, "a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). "When this occurs, the court may disregard the affidavit as a sham." *Rollins*, 833 F.2d at 1530 (citing *Van T. Junkins*, 736 F.2d at 658-59). Courts are admonished to "apply this rule sparingly," however, "because of the harsh effect [it] may have on a party's case." *Rollins*, 833 F.2d at 1530.

Moreover, a mere discrepancy will not justify a district court's refusal to accept such evidence. *See Tippens v. Celotex Corporation*, 805 F.2d 949, 954 (11th Cir. 1986); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

> To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the

---

[116]Doc. no. 45 (motion to strike).

greatest weight if credited at all.  Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.  An affidavit may *only* be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."

*Tippens*, 805 F.2d at 953-54 (quoting *Van T. Junkins*, 736 F.2d at 657) (emphasis supplied).  Thus, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Rollins*, 833 F.2d at 1530.

Defendant argues that plaintiff's statement in her affidavit that "Neal Faulkner, Tim Faulkner, Lee Arnold, and Gary Henke *persistently and on a daily basis* made lewd and vulgar remarks to myself and other employees, and made lewd and vulgar sexually explicit jokes *on a daily basis*"[117] contradicts her prior deposition testimony.[118]  Defendant emphasizes plaintiff's deposition testimony that her co-workers engaged in "just the usual, everyday profanity," and that she *periodically* was called "Virgin Ears" and "Goody Two-Shoes" by a co-worker.  Defendant also emphasizes that very few of the offensive statements made by plaintiff's co-workers actually were directed toward her, that plaintiff never was touched or propositioned

---

[117]Jones Affidavit, at 1 (emphasis supplied).

[118]Motion to strike, at 1-2.

in a sexually offensive manner at work, and that plaintiff often ignored the sex-related jokes told at work.  Thus, defendant contends that plaintiff's deposition testimony cannot reasonably be construed to indicate that her co-workers used offensive language "persistently and on a daily basis."

However, defendant fails to point out that plaintiff also testified at her deposition that she suffered through "several incidents of profanity constantly."[119] She testified that Gary Henke "was really bad" to use profanity when he was within her hearing, suggesting that Henke's profanity usage was routine.[120]  Indeed, she testified that "every other word is bad out of [Henke's] mouth."[121]  Further, she testified that her co-workers talked about sex "every day."[122]  Taken as a whole, plaintiff's deposition testimony is not inherently inconsistent with the statement in her affidavit that she was subjected to offensive language and jokes "persistently and on a daily basis."  Thus, plaintiff's affidavit should not be dismissed as a "sham."

### 2.    Plaintiff's affidavit is relevant to her claims

Defendant also argues that the sentence in plaintiff's affidavit stating that, "[a]s a result of my complaints to Wal-Mart management, co-employees switched tags on

---

[119]Jones Deposition, at 48.

[120]*Id.* at 37.

[121]*Id.* at 61.

[122]*Id.* at 50.

my pallets of freight, causing me to eventually be terminated from my job in the dock area," should be stricken.[123]  Defendant asserts that plaintiff's statement could support only a retaliation claim, and that it should be stricken because plaintiff did not assert a retaliation claim in her complaint.[124]  *See Wu v. Thomas,* 996 F.2d 271, 275 (11th Cir. 1993) (testimony that was "irrelevant to anything pled in the complaint" was properly excluded from evidence).  The court disagrees, because plaintiff's statement that her co-employees' retaliatory tag-switching ultimately resulted in her termination *is* relevant to the argument, raised in plaintiff's brief, that defendant's proffered legitimate, non-discriminatory reasons for terminating plaintiff are merely a pretext for unlawful sex discrimination.

In summary, the court concludes that plaintiff's affidavit is not a sham, and that it is relevant to the claims asserted in her complaint.  Therefore, defendant's motion to strike the affidavit should be denied.

## B.    Abandonment Of Intentional Infliction Of Emotional Distress Claim

At the summary judgment stage, plaintiff effectively abandoned her claim for

---

[123]Motion to strike, at 2-3.

[124]Defendant's statement that plaintiff did not plead a retaliation claim in her complaint is well-taken.  Indeed, the only claims in plaintiff's complaint are for (1) sex-based discrimination; (2) hostile work environment; and (3) intentional infliction of emotional distress.  Plaintiff does offer argument in her brief, and make statements in her deposition and affidavit, which, at first blush, seem to support a retaliation claim.  Because plaintiff has not asserted a retaliation claim, however, no such claim will be considered by the court.

intentional infliction of emotional distress.  Plaintiff has offered *no* response to defendant's well-supported arguments that summary judgment should be granted on that claim.  Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g., Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675,* 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz,* 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (some

citations omitted).[125]

## C.    Sex Discrimination

Plaintiff alleges that her termination was the result of unlawful sex discrimination.[126] To establish a prima facie case of sex-based discrimination in the

---

[125] *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).
  Because plaintiff has abandoned her claim for intentional infliction of emotional distress, the court need not address defendant's argument that it is not liable for the intentional torts of its employees. *See* brief in support of summary judgment, at 30-32.

[126] *See* complaint, at ¶¶ 12-15. Plaintiff also states that she "was forced to acknowledge and accept mistakes that she did not make, but were in fact purposefully done by male employees of Defendant." *Id.* at ¶ 14. This statement could be construed to allege that plaintiff also was subjected to discriminatory discipline, falling short of the level of termination. However, since plaintiff's discipline ultimately led to her termination, plaintiff's discrimination claim is, in essence, one for termination. Indeed, plaintiff discusses the claim in terms that are synonymous with a termination claim in her brief.
  However, even if plaintiff's claim were construed as one for disparate treatment in the application of workplace discipline *not* rising to the level of termination, plaintiff still would not be able to establish a prima facie case. A plaintiff desiring to establish a prima facie case of disparate treatment in the application of disciplinary measures must show: (1) that she is a member of a protected class; (2) that she engaged — either disputedly or admittedly — in misconduct similar to that of similarly situated co-employees outside the protected class; and (3) that the similarly situated co-employees outside the protected class received more favorable treatment than plaintiff: *i.e.,* despite such similarities, "the disciplinary measures enforced against [her] were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d at 1540; *see also Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Davis v. Qualico Miscellaneous Inc.*, 161 F. Supp. 2d 1314, 1319 (M.D. Ala. 2001).
  As discussed *infra*, plaintiff has identified no male employee who received more favorable

termination of employment, plaintiff "must . . . show that (1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; (3) [her] employer treated similarly situated employees outside of the protected class more favorably; and (4) [she] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)); *see also, e.g., Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).[127]

As a female, plaintiff is a member of a protected class. The termination of her employment clearly was an adverse employment action. *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination

---

treatment than she received, after committing errors similar to those she committed. Thus, plaintiff is unable to establish a prima facie case for disparate treatment based on discriminatory discipline for violations of workplace rules.

[127]The Eleventh Circuit has, in some cases, employed a slightly different formulation of the prima facie case for discriminatory discharge: *i.e.,* that (1) plaintiff was a member of a class of persons protected by the statute; (2) she was qualified for the position from which she was discharged; (3) she nevertheless was terminated; and (4) following her discharge, the defendant either replaced plaintiff with someone outside the protected class, or retained other employees who were not within the protected class, and, who possessed comparable or lesser qualifications. *See, e.g., Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306, 1311 n.6 (11th Cir. 1998); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir. 1980).

Plaintiff could not establish a prima facie case under this formulation. As stated *infra,* plaintiff is a member of a protected class; she was qualified for the position from which she was discharged; and she nevertheless was terminated. However, plaintiff has produced no evidence that defendant replaced her with a male, or that defendant retained other male employees who possessed comparable or lesser qualifications.

is the "classic and ultimate 'tangible employment action'").

Plaintiff also was qualified to do her job.  Defendant asserts that plaintiff was not qualified to do her job, because, as a result of her continued accuracy and procedure errors, she failed to meet her employer's performance expectations.  The court disagrees.  In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of his or her job often is not an issue.  *See Crapp*, 242 F.3d at 1020.  The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred."  *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).  Accordingly, assertions that a plaintiff was not "qualified" usually go more to the credibility of the employer's stated reasons for the termination.  *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) ("[A]llegations of poor performance against plaintiffs discharged from long-held positions may be properly considered . . . when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.").

However, plaintiff cannot prove the third element of her prima facie case: *i.e.,*

that defendant treated similarly situated male employees more favorably than she was treated. To satisfy this element, plaintiff must show that employees outside her protected class (males) were found guilty of the same or "nearly identical" misconduct, yet were not terminated for their actions. *Manacia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999). "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir. 2000).

Plaintiff has identified only one co-worker who incurred procedure or accuracy errors, but who was not properly disciplined for the errors — Ranae Lee, a female. A careful review of the record reveals *no* evidence of any male employee at the Distribution Center who was not disciplined for committing errors similar to those plaintiff committed. Thus, plaintiff has failed to establish a prima facie case of sex discrimination, and her discrimination claim fails as a matter of law. *See Walker v. Mortham,* 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that "a Title VII plaintiff cannot succeed in proving that she was intentionally discriminated against if she does not establish a prima facie case of discrimination").

**D.     Hostile Work Environment**

Plaintiff claims that her co-workers' offensive behavior caused her to be subjected to a sexually hostile work environment. To succeed on this claim, plaintiff

-32-

must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer responsible under a theory of either vicarious or direct liability. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

Plaintiff easily satisfies the first two elements. As a female, she belongs to a protected group. *See Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman."). Further, plaintiff was subjected to unwelcome harassment. The other elements require more careful consideration, however.

### 1.    "Based on sex"

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . *because of* . . . sex.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201

(1998) (emphasis supplied); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.") (Edmondson, J., concurring).

The "critical issue," according to the Supreme Court, "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S. Ct. 367, 372, 126 L. Ed. 2d 295 (1993) (Ginsburg, J., concurring)). Stated somewhat differently,

> [t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion. ... In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that *but for the fact of her sex*, she would not have been the object of harassment. ...

*Henson*, 682 F.2d at 903-04 (citations omitted) (emphasis supplied). "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; *the mistreatment must be because the employee was female.*" *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (emphasis supplied).

When the allegedly harassing conduct is not clearly sexual in nature, a plaintiff may be required to make a showing that co-workers of the opposite sex were treated better. *Mendoza*, 195 F.3d at 1254 (Edmondson, J., concurring) ("[W]hen the sexual

-34-

content of a supervisor's conduct is not obvious, a plaintiff asserting a claim of sexual discrimination in employment must present some evidence that plaintiff's co-workers, those not of plaintiff's sex, were treated differently and better. Otherwise, Title VII's *vital* element — discrimination [*i.e.*, disparate treatment] — is read out of the statute." (emphasis in original)).

When both male and female employees are subjected to the same offensive behavior, or when the behavior derives from a generally profane and vulgar work environment, a hostile work environment plaintiff will not recover, because any harassment the plaintiff may have suffered was not based on his or her gender. The United States District Court for the Middle District of Florida reached this conclusion in *Weinsheimer v. Rockwell International Corp.,* 754 F. Supp. 1559 (N.D. Ga. 1990), *aff'd,* 949 F.2d 1162 (11th Cir. 1991). The female plaintiff in *Weinsheimer* alleged that her male co-workers had subjected her to a sexually hostile work environment by directing offensive comments, blatant sexual innuendo, and even violence, at her. *Id.* at 1561.[128] Nonetheless, the testimony at the bench trial indicated that plaintiff's workplace "was an environment replete with sexual innuendo, joke telling and general

---

[128] Specifically, Weinsheimer complained that a male co-worker repeatedly asked her to "suck him" or "give him head," looked at her crotch and begged her to "[g]ive [him] some of that stuff," and grabbed at her crotch and breast. *Weinsheimer,* 754 F. Supp. at 1561. The male co-worker also allegedly pushed Weinsheimer into a filing cabinet, banged her head against the ground, and held a knife to her throat. *Id.* Plaintiff also alleged that a different male co-worker placed his penis in her hand, and that a male supervisor patted plaintiff on the buttocks and requested oral sex from her. *Id.*

vulgarity. . . . [T]he banter and vulgarity was engaged in by nearly all employees, male and female alike." *Id.* Indeed, the plaintiff herself often engaged in the same offensive behavior about which she complained in her lawsuit. *Id.*

The court held that "'the conduct complained of [was] equally offensive to male and female co-workers.'" *Id.* at 1565 (footnote omitted) (quoting *Henson,* 682 F.2d at 904). Most of the co-workers' comments "were not based upon sex, as such, but were merely continuations of, and part and parcel of, the pervading [general work] environment." *Weinsheimer,* 754 F. Supp. at 1565. Other comments were based on plaintiff's co-workers' perception that she was a poor and unreliable worker. *Id.* Because the conduct Weinsheimer complained of was "not sexually motivated," Weinsheimer could not succeed on her hostile work environment claim. *Id.*[129]

Similarly, in the instant case, plaintiff primarily complains that the general use of profanity in her workplace constituted a sexually hostile work environment. However, there is no evidence that plaintiff's co-workers used profanity *because she is a female,* or that plaintiff was especially offended by the language *because she is a female.* Plaintiff testified that her co-workers used offensive language because they were frustrated with their work, or with each other. Both male and female co-workers

---

[129]The court also held that the conduct Weinsheimer complained of was not "unwelcome," and that it was not sufficiently severe or pervasive to support a hostile work environment claim. *Weinsheimer,* 754 F. Supp. at 1563-64, 66-67.

used the language plaintiff found offensive, and both male and female co-workers told sex-related jokes. Both male and female employees used profanity in the hearing of managers, and managers used profanity in the hearing of male and female employees. Most of the language was not directed specifically at plaintiff. Rather, the language simply was "part and parcel of[] the pervading [general work] environment" at the Distribution Center. *See Weinsheimer,* 754 F. Supp. at 1565. Thus, plaintiff cannot rely on the general use of profanity in her workplace to support her sex-based hostile work environment claim. *See Holman v. Indiana,* 211 F.3d 399, 403 (7th Cir. 2000) ("Title VII does not cover the 'equal opportunity' or 'bisexual' harasser, ... because such a person is not *discriminating* on the basis of sex.") (emphasis in original); *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 965 (8th Cir. 1999) (profanity directed toward both male and female employees, including use of the word "fuck," was not based on sex); *Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134 (7th Cir. 1997) (holding that conduct that is equally offensive to both male and female employees is not based on sex); *Henson,* 682 F.2d at 904 ("[T]here may be cases . . . where the conduct complained of is equally offensive to male and female workers. . . . In such cases, the sexual harassment would not be based upon sex because men and women are accorded like treatment."); *Pospicil v. The Buying Office, Inc.,* 71 F. Supp. 2d 1346, 1356-57 (N.D. Ga. 1999) (supervisor's use of "everyday profanity and [sexual] innuendo,"

including the word "fuck," was not actionable, when it occurred in the presence of both males and females).

Plaintiff, nevertheless, has pointed to several occasions on which her co-workers' offensive conduct was specifically directed at her. Plaintiff alleges that: (1) Gary Henke intentionally used profanity in her presence, because he knew the language offended her; (2) Henke and other male employees called her names such as "Ms. Goody Two-Shoes" and "Virgin Ears"; (3) Lee Arnold confronted her, told her that "he could go down any GD aisle and do anything he D wanted to do to any of the pallets and there's not anything the SOBs up front could do about it," said "fuck you," and threatened to "get" her; and (4) her co-workers intentionally switched the tags on her pallets of freight in order to cause her to be disciplined. These incidents also were not based on plaintiff's sex.

Courts have begun to draw distinctions between "actions based on discriminatory animus" — *i.e.*, those in which the harassment complained of was committed *because of the plaintiff's sex* — "and those based on *personal animosity resulting from failed consensual relationships*" or other personal conflicts. *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1200 (11th Cir. 2001) (*quid pro quo* claim) (emphasis supplied);[130] *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808-10

---

[130]The *Pipkins* Court took care to observe that:

(7th Cir. 2001) (finding no liability for a sexually hostile work environment where the harassers' motivation was not the plaintiff's gender, but instead was retaliation for plaintiff's previous complaint to management about an employee's behavior); *Succar v. Dade County School Board*, 229 F.3d 1343, 1345 (11th Cir. 2000) (per curiam) (harasser's motivation was not the plaintiff's gender, but instead was anger over the fact that plaintiff had broken-off a consensual sexual relationship).

> "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination. . . . The plaintiff cannot turn a personal feud into a sex discrimination case. . . ." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (footnote and internal quotation marks omitted). We do not disregard this precept of sexual harassment law simply because the plaintiff and the alleged harassing party had a past sexual relationship. Regardless of the factual context, our analysis focuses only on whether the complaining employee was targeted because of his or her gender. . . .

*Succar*, 229 F.3d at 1345 (some citations omitted).

The four incidents described above were based on personal animosity or a retaliatory motive, not on gender. First, plaintiff alleges that the harassment she endured was based upon her sex, because "[m]ale employees intentionally carried out

---

This court does not today decide that once a consensual relationship between a supervisor and a subordinate is established, the subordinate could never then become victim to *quid pro quo* sexual harassment by that supervisor subsequent to the termination of the relationship. We hold only that the facts and circumstances of this case operate to take the motivation for any harassment that might have occurred out of the scope of Title VII.

*Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

[the] acts to offend [her.]"[131] The only evidence in the record consistent with this allegation is plaintiff's testimony that Gary Henke intentionally used profanity because he knew it offended her.  However, there is no evidence that Henke sought to offend her *because she was a female*, or that he used language that would have been offensive only to a female.  Rather, Henke's purposeful use of profanity around plaintiff appears to be based on his personal dislike of her, and on his disdain for her intolerance of profanity.  In other words, because Henke knew plaintiff did not like profanity, he used it to antagonize her.

The name-calling plaintiff complains of also was not based on her sex.  Plaintiff testified that Henke called her "Ms. Goody Two Shoes" and "Virgin Ears," because he knew she did not approve of his profanity usage.  Other employees also began to call her these names after the employees learned of plaintiff's complaints to management.  Although only male co-workers called plaintiff "Ms. Goody Two-Shoes" or "Virgin Ears," there is no indication that the name-calling was based on plaintiff's sex.  The term "Ms. Goody Two-Shoes" could just easily have been applied to a "*Mr.* Goody Two-Shoes" who complained about profanity in the workplace, and either a male or a female could be sensitive enough to have "Virgin Ears."  Rather, the name-calling was motivated by personal animosity and retaliation.  Plaintiff's co-

---

[131]Brief in opposition to summary judgment, at 4.

workers were resentful toward plaintiff because she disapproved of the language they used, and they were angry with her for complaining about them to management.[132]

Similarly, the confrontation plaintiff had with Lee Arnold was not based on her sex. Arnold clearly made his offensive comments because he was angry with plaintiff over her refusal to lie to management to keep him out of trouble. The comments were not motivated by plaintiff's gender.

Further, plaintiff cannot rely on the allegation that her co-workers intentionally switched the tags on her pallets of freight to support her claim for a sexually hostile work environment. Plaintiff testified that she believes Lee Arnold switched her tags to follow through with his threat to "get" her. She also testified that other co-workers switched her tags in retaliation for the complaints she made to management. There is no evidence that any of the tag-switching was based on plaintiff's gender.

Indeed, plaintiff has identified only two incidents of alleged harassment which can reasonably be construed to be based on her gender. The first is Neal Faulkner's comment that he was "not going to fuck [plaintiff]." The court finds it highly unlikely that Faulkner would have directed this blatantly sexual comment to a *male* co-worker. The other is the incident in which Gary Henke placed his hand on a female's buttocks while plaintiff was watching. *See Pospicil,* 71 F. Supp. 2d at 1357 (recognizing that

---

[132]Again, the court emphasizes that plaintiff has *not* pled a retaliation claim.

a female plaintiff may demonstrate a sexually hostile work environment by pointing to harassment of other women, as long as plaintiff is actually aware of the harassment) (citations omitted).

### 2.    Severe or pervasive

The requirement that the alleged harassment must be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective and a subjective component.  To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993).

When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  However, the factors, taken together, must reveal

-42-

conduct which is so extreme that it caused a material change in the terms and conditions of plaintiff's employment and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283-84, 141 L. Ed. 2d 662 (citations omitted).

Further, the individual statements and acts complained of must each be (or arguably be[133]) of a sexual or gender-related nature *before* they may be taken into account when determining whether, when considered collectively, they were sufficiently severe or pervasive to create an actionable hostile work environment.

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, *see Mendoza*, 195 F.3d at 1242, the statements and conduct must be of a sexual or gender-related nature — "sexual advances, requests for sexual favors, [or] conduct of a sexual nature," *id*. at 1245 — before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a "general civility code." *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283-84.

*Gupta*, 212 F.3d at 583.

Thus, the court may only consider Neal Faulkner's comment that he was "not going to fuck [plaintiff]," and Gary Henke's touching of a female employee's buttocks

---

[133]*See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000) ("We will now consider comments and behavior of [the alleged harasser] that are, *or arguably could be*, considered to be of a sexual or gender-related nature. We doubt some of it is, but for present purposes we will assume it to be.") (emphasis supplied).

— the only two incidents which were based on plaintiff's gender — in its analysis of whether the "severe or pervasive" element has been met.

Both of these sex-based incidents could reasonably be considered severe and humiliating. Faulkner shouted his blatantly sexual comment to plaintiff in the presence of other employees. Further, Henke's touching of a female employee's buttocks clearly is severe, and plaintiff could reasonably have felt humiliated when she saw Henke grab the female employee's buttocks, especially since Henke laughed when he noticed plaintiff was watching him.

Even so, there is no evidence that either of these incidents unreasonably interfered with plaintiff's job performance. "To show alteration of job performance, a plaintiff need not show tangible effects such as economic harm. However, the plaintiff must show some *material* alteration of job performance from a reasonable person's standpoint." *Lawrence v. Wal-Mart Stores, Inc.,* 236 F. Supp. 2d 1314, 1326 (M.D. Fla. 2002) (internal citations omitted) (emphasis supplied). To support her assertion that her co-workers' conduct unreasonably interfered with her job performance, plaintiff merely recounts that the incidents occurred, as if their effect on her job performance is so obvious that it need not be explained.[134] The court does not

---

[134]Brief in opposition to summary judgment, at 5. The court acknowledges that plaintiff's job performance did ultimately decline to the point that her employment was terminated. Plaintiff could reasonably argue that this decline in her job performance was a result of *all* of the offensive language, joke-telling, and retaliatory tag-switching she suffered at the Distribution Center.

find the material alteration of plaintiff's job performance to be quite as obvious as plaintiff's brief suggests. In fact, the court finds *no* evidence in the record that the two relevant incidents materially affected plaintiff's performance, or ability to perform the duties of her job.

The most important factor in evaluating the severity or pervasiveness of the two sex-based incidents of which plaintiff complained is the frequency with which they occurred. Plaintiff worked as a slotter for approximately two years, and she endured only two sex-based harassing incidents during that time period. Although "there is no magic number for frequency," the relevant case law indicates that two incidents over a two-year time period should not be considered "pervasive." *Lawrence*, 236 F. Supp. 2d at 1325 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). *Compare Miller*, 277 F.3d at 1276 (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson*, 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent), *with Mendoza*, 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were

---

However, as discussed *supra,* most of this behavior was not sex-based, and it cannot be considered to support plaintiff's hostile work environment claim. Plaintiff has produced no evidence that the two incidents which *can* be considered caused her job performance to be materially altered.

insufficiently frequent), *Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient).

Considering the totality of the circumstances, the court finds that the two sex-based incidents plaintiff endured were not sufficiently severe or pervasive to materially alter the terms and conditions of plaintiff's employment.[135] Plaintiff's work environment may have been unpleasant or personally offensive, but it did not rise to the level of an actionable hostile work environment based on sex. Accordingly, summary judgment should be granted on plaintiff's hostile work environment claim.[136]

## IV. CONCLUSION

Defendant's motion for summary judgment will be granted in its entirety. Defendant's motion to strike will be denied. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[135]Because plaintiff cannot establish that the sex-based conduct to which she was subjected was sufficiently severe or pervasive as to alter the terms and conditions of her employment, the court need not decide whether plaintiff has satisfied the final element of her hostile work environment claim, *i.e.,* that there is a basis for holding defendant liable.

[136]Because summary judgment will be granted on all of plaintiff's underlying substantive claims, the court need not address defendant's arguments that plaintiff failed to mitigate her damages, and that plaintiff is not entitled to punitive damages.

DONE this __18th__ day of March, 2004.

_____
United States District Judge